I please the Court, Catherine Davis for Petitioner Dora de Leon. Petitioner submits that in this case the IJ stated reasons for denying relief are not supported by substantial evidence. In denying de Leon's claims, the IJ stated three reasons. Number one, that the 1985 death threat was too remote to support an objectively reasonable fear. Number two, that de Leon had remained in the country for several years after the 1985 threat without incident. And number three, that the 1985 threat remained unfulfilled. However, these reasons fail to take into consideration record evidence that in 1992, seven years after the first threat in 1985, de Leon was threatened with death on a second occasion by the same group who threatened her in 1985. What's the evidence that that threat wasn't actually related to her political position as opposed to a gang of thugs who, as the application said, told her that they were going to kill her if she blew the whistle on them, and they could call her a communist and therefore that would give them an excuse to kill her? How does that translate into a political reaction? Well, I think, well, two things. As Your Honor points out, the record does indicate that the three members of the Canton police approached her personally and threatened to kill her if she were to reveal that they were the ones responsible for the neighborhood robberies. But it also points out that they threatened that they would have an excuse to kill her based on her affiliation with the UCN. That's an excuse, that's not a cause. Arguably that's correct. As we cited in the brief, however, I think the case law is fairly clear that mixed motive threats still can be on account of or satisfy the on account of PROM. The point is here that that threat was never adjudicated or at least expressly considered in the I.J.'s decision. So we couldn't possibly know whether the I.J. would have found that it was sufficient. Why did she say that? She obviously addressed the forum. She said she would be killed by members of the patrol that operated in her town. And she's referring, obviously, to the forum because that's what she's going through on Excerpt of Record 15. Excerpt of Record 15? That's her. The oral decision? The I.J.'s oral opinion. I was troubled by your argument, but as best I can make out on page two of her ruling, February 3rd ruling, she's talking about the application, and she seems to be summarizing the application. And then she, on the next page, turns to the testimony. I mean, certainly that's a reasonable construction of the opinion. The application was submitted into evidence. The problem here is that De Leon did testify at the hearing that she was confronted by the robbers in 1992. She testified to the knock on her door in 1992. So the fact that the I.J. referenced that particular point without referencing the death threat suggests to me, anyway, that it wasn't expressly considered. And I think the more important point is we can't know whether it was expressly considered. I would submit that this would be a very different case if the I.J. had expressly stated, look, there's this threat that's testified to in 1985. She also refers to this death threat in 1992. But, you know, I feel that either she doesn't meet the on-account-of prong, or that she was, you know, there was an adverse credibility determination. Whatever the findings may have been, that would be one case. How credible is the 1992 threat when she left Guatemala and left her child there? Well, I think that that Doesn't that indicate it wasn't a very credible threat at all? Well, I'm not sure that it does. The Respondent didn't raise that argument. But my understanding of the case law is that unless the family members who remain or the people who have been left behind are similarly situated, that the fact that a petitioner leaves someone behind is not relevant to a finding of well-founded fear. And in this case, or credibility anyway, and in this case, one could argue that the very fact that she did leave her 7-year-old son behind 5 days after the 1992 threat in fact militates in favor of a positive credibility finding here. I think, again, the most important thing from my perspective to recognize is that we can't know whether there would have been a positive credibility determination or whether she would have met the on-account-of prong because it appears from the oral decision that the 1992 threat was just not adjudicated. Well, that's what I'm having trouble with. When the judge, the I.J., goes through the form, and obviously, at least I think it's obvious, that she's on page 2 talking about what she's seen on the form, and then she comes back to the next page, starts on testimony, because after, for example, and maybe I don't want to over-read this, but in the last paragraph on page 2, she's talking about the point I mentioned, killed by members of the patrol and so on. She says she was mistreated and threatened because she's poor. She notes that she traveled through Mexico about a week and continued to the United States. That statement, I think, about Mexico, on record 59, it's the answer to question 28. I traveled through Mexico for about a week, one week, on my way to the United States. So that's why I was understanding that this summary was in fact her review of the application. And then she goes on to the testimony. So I'm not sure what our role is here, too. Let's assume that's correct. Does that then, are you still arguing that notwithstanding the IJ accepting that that's what she was doing, has reviewed the written application and combined it with the testimony, that that's not substantial evidence? Well, if I may respond, may I respond to your reading of the application for one moment? I'm just looking through it. You raise a very, I don't think you're wrong. I think she clearly considered it, she stated on the record that it was considered, it was admitted as an exhibit. But I'm not sure she considered the last page. I'm just sort of listening to what you're saying here. And all the points that she points out on page 2, specifically that there were the robberies starting in 1991 and that she was threatened by members of the patrol that operate in her town, all of that is set forth on page 57. That's what I thought, too. But I don't see anything that she references on page 60, which is the the only page in the record and the only part of her written application that talks about the death threat, you know, which was at least partially on her account, partially motivated by her political opinion. She comes to the comes to the boy. Right. Right. On page. And then she talks about the 1991 robberies. The end of that paragraph. And she says she also says she would be killed by members of the patrol. Well, that information appears on. Right. But it also appears on the previous page, because when she was approached in 1985 by members of the. In fact, I would argue that it's. Let's see. Where does she talk about her rights not being respected? So your argument is that she never read page your construction and she never got the page or question extension of the question. Right. Thirty three. I would I would I would submit that that's not an unreasonable construction, particularly in light of the fact that she just didn't point it out. It would have been one thing again if she had made an adverse credibility determination or if she had tried in some way to reconcile the oral and the written testimony. And just to comment on the fact that the human rights were never respected. That's also on page fifty seven, not page 60. Miss Davis, is that is the UCN a communist organization? The continental right now in 1992 says we'll expose you as a communist. I'm trying to figure out whether there's a link between accusing her of being a communist and her membership in the UCN. Again, that's a very good point. And frankly, I have to confess that I don't know the answer to that. But again, I would submit that if the on account of prong wasn't adjudicated in the first place, there would kind of be no basis to review that. I just I can look through the country report before my rebuttal and try to find the answer if you'd like. Let's suppose they thought it was. Pardon me. The threatening force thought it was a communist organization. Would that be enough? I think that under the case law, again, I didn't brief that issue. But it's my understanding that that is enough if there was based on imputed political opinion or if there was perceived political affiliation. Do I have time to move to the second issue? Half a minute. Half a minute. All right. I'll be. I'll be very quick on the second issue. Petitioner challenges the adequacy of the BIA's opinion. And just very briefly. Certainly, it's beyond dispute that the BIA is entitled to summarily adopt the IJ's decision. That's clear. But only when the BIA makes it clear in its own opinion that it gave individualized consideration to petitioner's claims. So this turns really on whether the record is clear enough that the written application supplemented and was considered, if not by the IJ, then by the BIA. Correct. So it appears it wasn't considered by anybody. Yeah. It's the whole story. And if the BIA, just briefly, if the BIA indicates that it independently reviewed the record and if it indicates that it independently assessed the IJ's statement of reasons and decided because it felt they were correct and adequate to adopt them as its own, it's fine. If they sat around and looked at these records the way we've been doing today in court, then. It'd be fine. And they said it in their opinion. We've looked at this and we reject. Okay. They didn't do that. Thank you. Thank you, Your Honor. Good morning. John Cunningham from the Justice Department on behalf of the Attorney General, who's the respondent in this case. Listening to the first two arguments this morning, I heard echoes of the issues that I'll be discussing with the Court in this case and the next, which is whether the adjudicators below reached a reasonable response to certain issues or deficiencies in the evidence that came up before them. In this case, the immigration judge had an asylum application filed by the petitioner in 1995, which was very specific about the claims of harm. She said that in 1990, the people in her hometown organized the civilian patrol in an effort to combat gorillas. And she described her life in the marketplace and said that she would have conversations with these young men. And some of them treated her well. Most did not. They would steal from her. They would be rude to her. They would refuse to pay for the goods they took. And sometimes they would discuss politics with her and she would say to them, well, I don't like violence of any kind, whether it comes from the gorillas or from anybody else, and they would react to that. And then she said there began to be a series of home invasions where people would break into people's houses at the night and steal things and it became her suspicion that this was being done by members of this civilian patrol. And then she went on to describe a conversation she had with a member, with one of these young men, in which she expressed that suspicion. And then she said that the next day, or a few days later, she had this confrontation with three of them in which they said, if you say anything about us to the authorities, we will kill you and we'll have an excuse to kill you because we will say you are a member of this political party and that you are a communist. In answer to your question, Your Honor, the State Department report in the record does not give us any information about the UCN party. It references it as a legitimate political party, but it doesn't give any information on their ideology, whether they were left of center, center, or right of center. So there's no information that we can draw about whether the members of the civilian patrol might have had a colorable argument in accusing this person of being a... We don't know whether there's any connection between them saying they can expose her and they'll have an excuse to kill her because she's a communist and because of her prior membership and activities with the UCN. We do not. We don't know whether, even in their minds, whether they have linked those two things. That's correct, Your Honor. That's correct. But the real problem arose during the hearing in this case where the petitioner went on the witness stand and was questioned by her attorney about the basis of her... Before we move... Yes, Your Honor, of course. She also says in that that I was mistreated and threatened by members of the local patrulla countenal because I am poor and I cannot defend myself. They abused their authority. They did not like me because I have different political opinion from them and also because I discovered that they were robbers during the night. That's right. So at least if we're going to give credit to her written application and the... whatever they said, being a subversive or communist, she's introduced that. There's nothing in the EJ's, before you move on to the testimony, there's nothing in this ruling on page 2 of the ruling, ER 15, where the IJ evaluates whether that's a true political threat or whatever. That's correct, Your Honor. And the question is... Leaving it kind of open to question whether the IJ was focused, as we're now focusing, or didn't get to that part of the form and was basing it on the information before. That's correct. And I think the question is... I think two things are clear in this case. One is that the IJ did review the written application. I think that's already been established. The second question... I think the second thing that's clear is that the IJ based her decision on what the applicant actually said at the hearing. I think that she turned her decision on the applicant's oral testimony and that's the issue in this case, whether the IJ was reasonable in doing so. That's what I meant by saying that the adjudicator, the trial court, reached a reasonable process given the evidentiary problem that the court had. And the problem is clear if the court reviews pages 36 to 40 of the record. That's where the applicant, Mr. Leon, was being examined by her attorney and Mr. Vega. And he begins by asking her, you were threatened in your country. Answer, yes. When did that occur? When? What month and year? In the year of 85. This is on page 37 of the record. And she goes on to describe that she was threatened by members of the Canton police. And Mr. Vega says, this is at the bottom of page 37, what is the Canton police exactly? Answer, it's like the guerrillas. Well, this is an immediate problem because Mr. Vega then began to conflate the Canton police with the guerrillas. His next question is, why did the guerrillas threaten you if you know? And she says, because I used to distribute flyers. And then he says, well, when you were threatened in 1985 by the guerrillas, what exactly was it that they did to you or said to you? Answer, that they would kill me if I didn't join them, if I didn't become a member of their group. This is a new claim. This is an entirely different claim than what she said on her written application. Question, did they harm you in any way at that time? Answer, no, I was only threatened. Two lines down, Mr. Vega, I think, began to realize that he had a problem, that his client was not testifying consistently with her written application. Two lines down, he begins to try to get her to repeat what she had said on her written application. Question, did you have any other problems with anyone after this incident in 1985? Answer, I heard that someone was knocking at my door. He says he doesn't know what she meant by that and asked her to explain. Then she says, that is what happened from 1985 until 1990. These same members were coming to the houses to steal. Now, the time frame here is important. She says this happened between 1985 and 1990. I think in my colleague's brief, she tries to reference that answer to forward to the 1992 description. But Ms. Vega, Mr. Leong, undercuts that by saying, no, I had no other problems during that time. There's an inconsistency because in her written application, she said that the civilian patrol was not even started until 1990. Now she's saying that from 1985 to 1990, they would come into the houses to steal. But she also says, that didn't happen to me. I had no problems. Well, that's not exactly – I mean, the IJ recites both the application and the testimony. But she doesn't find – in fact, she, I think, finds that this applicant was credible. Yes. She was in good faith and whatever. She just said, wait a minute, your concerns arise in 1985. I don't see anything. Based on your oral testimony, you're not invoking 1992. So then the question is, does the IJ have some obligation? Should there have been some reference back, some question saying, well, wait a minute. You know, you put this in your application. You talk about this confrontation. I and Judge Bybee have asked about what's this – you say the lawyer conflated Canton police and guerrilla. Well, I mean, the IJ didn't question that. It just sounds political. So that's the difficulty in this case, trying to figure out whether or not the IJ, who appears to have been very open and sympathetic, and a record that on the oral side was ambiguous and confused, whether there should be more here so that we're confident that the IJ actually did pick up on what she was saying happened in 1992. That is the – She does allege in the writing that she was threatened with death, and so – In 1992. In 1992. But then on pages, as I said, on pages 36 through 40 of the record, her lawyer repeatedly tried to get her to repeat what she had said on her written application, and she repeatedly said, I had no difficulties after 1985. She said that three different times, by my count, in her testimony. And I think what happened was the immigration judge simply decided to take the testimony as the true basis for the asylum claim. And the issue is, did the immigration judge have a duty to in effect step in and try to clarify this problem? I think that the – Mr. Vega, the lawyer for the petitioner, went right up to the edge of not being leading, as he wasn't supposed to be. He tried several times to say, well, now, is there anything else you want to tell us? No. Is it a little troublesome? Why shouldn't the IJ, with that in front of her, since she does invoke it – I think – Get the clarification. I mean, this isn't just – I mean, this person, if she is right, if the application is right, and she goes back and is killed going back to her village because the lawyer didn't ask the leading question or whatever, when it's right there in the record, isn't that a bit troublesome? It's a difficult question, Your Honor. And this is, of course, the point made by my colleagues in their very well-written briefs. The law is clear, the regulations are clear that immigration judges have a duty to develop the record. No one disputes that. This Court's case law has made it clear in cases such as Aguiman that that's particularly important when the alien is appearing pro se before the immigration judge. That's not this case. This person was represented. The other thread that goes through the Court's cases is the immigration judge has a duty to be a neutral fact finder, to not take sides. This issue usually comes up in cases where the Court believes that the immigration judge is being unduly harsh toward the alien, is in effect prejudging her case, is not giving the alien a fair opportunity to make her case. So the unspoken question is, does the immigration judge have an affirmative duty to, in effect, become a second counsel for the petitioner? In a case such as this, where the petitioner had every opportunity to make her case, was questioned at length by her attorney, who did everything he could to try to clear up the problem that was obviously developing between her oral testimony and her written testimony, did the immigration judge have an affirmative duty to step in and say, well, your lawyer didn't ask you the right questions, so I will. I'm aware of no case. All she had to do was say, but I have your application. What did you mean when you said in 1992? And clarify the point. She could have done that, Your Honor. She could have done that. The question is, is that reversible error? Because she didn't do it. In a situation on these facts, where the alien repeatedly testified that after 1985 I had no problems, she also said that she decided to leave in 1990. This was at the hearing. That's completely inconsistent with her written testimony, where she said the patrol didn't even begin until 1990. Her problems didn't actually occur until 1992. I simply suggest that on these facts, at least, the immigration judge was reasonable in declining to take the affirmative step of stepping into the shoes of the petitioner's counsel to try to help the petitioner meet her own burden of proof, which an asylum case rested on the petitioner. My red light is on. Yes. Okay. And I thank the Court for its attention. Any questions? All right. Thank you very much. I'll give you a minute for a rebuttal. Thank you. I think the Court has identified perfectly well the central issue here, and that is simply this. I don't think the petitioner is contending that the I.J. had any obligation to step into the shoes of counsel and make de Leon's case for her. Rather, the issue is simply, was there a duty to consider, at least on the record, the written application? And in this case, it's beyond dispute that there is no evidence that the I.J. did consider the pertinent facts, in particular the 1992 death threat. The I.J. does have a duty to consider the written statement, to examine the witness, to develop the record, whether or not that witness appears pro se. At no point in the oral testimony did de Leon recant her written statement, formally or otherwise. At best, as Respondent's counsel points out, it created an inconsistency which warranted further exploration by the I.J. Again, I submit simply that it would have been perfectly reasonable for the I.J. to compare the written and the oral testimony, make even perhaps a different credibility determination, and then make her findings. But that wasn't done here, and I would submit that it should have been. All right. Thank you. The case that's argued will be submitted. We thank both counsel for their arguments. That brings us to the next case. Maglay Couchet-Ortega v. Ashcroft. I'm wondering, Your Honors, may it please the Court, Roberto Amaya for Petitioner Fidelia Couchet-Ortega. At this time, I would like to reserve one minute for rebuttal time. Okay. Just watch your clock. Your Honors, in this case, Petitioner's faith-amending right to due process during deportation proceedings was violated by the immigration judge because she was deprived of her right to a full and fair hearing by one, the denial of her right to present all evidence in her asylum case. Specifically, the immigration judge's refusal to hear the testimony of two expert witnesses present on that date, they would have given credibility to Petitioner's testimony and the merit of her asylum claim. And two, because the Board of Immigration Appeals and immigration judges' adverse credibility finding is not supported, considering Petitioner's reasonable explanation for the discrepancies between the 1993 asylum application and the 1999 asylum application, in light of her educational background and the circumstances surrounding the filing of the first asylum application, namely that she did not have knowledge that that application in 1993 was for asylum, when she believed that it was an application for special agricultural workers. How would the expert or experts have affected the credibility determination in light of the shifting testimony that the immigration judge and the BIA relied upon? In the testimony that the BIA and the judge relied on, there is a shifting between the 1993 and 1999, when it seems that the trial attorney refers to the 1993 application. She asked her whether she had said that she was not a member, and she said no. In other words, denying the answers that were in the 1993 application, because she never knew that there was a 1993 application. She was relying on the information that she had given in the 1999 application, which states that she was a member of a group, and she had suffered persecution in the past. What were the experts? The expert in this case was a psychotherapist who had sat down and met with the witness. He had listened to her case. He's dealt with cases that have been victims of torture, so the expert would have testified as to what he had met with her and whether her testimony and the circumstances that she had spoken about in her application were credible or not. He couldn't have gone directly to her credibility because he could not testify as to any conditions in Guatemala, could he? Not the first expert, but the second expert would have.  But the most that Dr. Luria could have said was, I've examined many other torture victims, and Ms. Kuche's statements to me are consistent with other people that I have seen. And he also made a psychological evaluation of her current state of mind and how that's been affected by the past events. So he would have been able to put a causal link between what's happening and what she is experiencing now. Well, it certainly wouldn't be proper for him to vouch for her credibility. Do you agree with that? Her credibility, no, but it would have probably given some guidance to the immigration judge, who this was the first time she had seen the 1993 application. So she was basing her impression also only on what she had just heard and on the application before her because she had never seen it before. So he had already spoken with her on many occasions. I'm sorry, I don't know how many occasions he had spoken with her, but he could have reinforced her, whether her story was credible or not, based on his experience. And was the second witness that she was prepared to put on, was that Dr. Quiroga or was that Mr. Bonpane? Mr. Bonpane. I'm not sure if Dr. Quiroga was in the waiting room or not during this date. And Mr. Bonpane was a country conditions expert, is that right? Yes, he was. He could have testified again. He had no personal knowledge of where she was or what she had done or who had said what to her. No, he couldn't have testified. He could have only testified as to conditions generally in Guatemala. He would have testified as to whether conditions she had referred to before were accurate to Guatemala or the conditions there. But her claims are very, very specific. They're sort of time, date, place about what she thought. I mean, this would have been very difficult for him to have been very specific in describing what was going on in Guatemala. I think he would have been able to describe more accurately as to what's going on now because it's the trial attorney who brought up the issue as to whether the conditions in the country have changed to a point where her fear of returning would be reasonable or not. And also, in this case, the judge did not behave as an impartial judge. There's a circumstance where once the 1993 application comes about, the judge calls for an off-the-record conversation and informs Ms. Kucha's attorney that she should consider taking voluntary departure only instead of pursuing the asylum application. This would show that before hearing all the testimony, hearing the expert witnesses, she had already begun leaning in one direction as to whether the asylum application or whether she was credible or not. Yes, but, Counselor, it only occurs after the district judge discovers that Ms. Kucha is quite wrong as to whether she's ever applied for asylum before. And, in fact, there's a discrepancy between her 1999 application and her 1993 application. There's a different story in those two things. She's complained about different, very different kinds of things. Yeah, but the story in the 1993 application was denied by the applicant. She said she had no knowledge that that application ever existed or that she ever filed that application. But she also testified that she filed the 1999 application after meeting somebody in Las Vegas who told her that she could apply for asylum and that prior to that time, she had never spoken with anybody about her circumstances in Guatemala, which wouldn't be true, would it? No, because the circumstances from 1993 were not related. She had not spoken relating to an asylum application. She believed she had gone to a notary to apply for a special agricultural worker's application, which are totally two different applications. So she wouldn't have spoken with somebody about the 1999 application or the instance. No, but in 1999, she testifies that she had waited that long. The question in 1999 that was put to her was, why did you wait so long to come forward with an asylum application? She said, well, I didn't know that I could apply for one. I've never spoken to anybody about these traumatic experiences until I meet somebody in Las Vegas who tells me I can apply for a political asylum. And that's impeached by her 1993 application, which indicates that, in fact, prior to 1999, she had spoken with someone about the conditions in Guatemala that drove her to come to the United States. That would only be assuming that in 1993, she did speak to the notary that she was applying for asylum. Is she claiming that she did not speak to the notary in 1993? She's claiming that in 1993, she did not speak regarding applying for asylum. Okay. But she does not deny that she spoke to a notary in 1993. She does not deny that. Is she denying that what the notary represented on the application which she signed in 1993 is not true? That is what she is claiming in her application. She's claiming that whoever wrote this down, whether she wrote it down or whether the notary wrote it down, that it's all wrong. Correct. And that her 1993 application or her 1999 application is the only one that we should pay attention to and nothing that the notary got down in 1993, which is an application that she signed. Correct. She's claiming that she does not have knowledge of the 1993 application. Does she? Counselor, okay, let's credit her claim that this was that she knew that she thought in 1993 that she was applying for special agricultural status and that she didn't realize it was an asylum application. What she signed was an application for agricultural relief. Now, as an agricultural worker. But that doesn't answer why the information that she would have provided in an application that she thought was for this special agricultural worker's program is wrong and that she signed that application. In many circumstances with notary assistants is that they have applicants sign blank applications telling them that this is what this application is for. And there will be no way to verify what information was placed first in the application, whether it was her signature or whether it was the information. But she didn't claim here that this was a blank application, did she? No. She claimed that when they were asking her questions regarding the 1993 application, she claimed that she believed the 1993 application was for agricultural workers. She never said I signed an application in blank. No. No. And going on that point, I know the government cites two cases, Valderrama and Harvey. In those two cases, there is knowledge by the applicant that they're about the two asylum applications. And here there is no knowledge regarding the first asylum application. So if we have two different asylum applications in Harvey and Valderrama, there is reason to reach an adverse credibility. But here we have one where she is denying knowledge of the first one as opposed to the second one. So we would have two different applications. Good morning again, Your Honors. John Cunningham from the Department of Justice on behalf of the Respondent Attorney General. A couple of factual clarifications, if I may, at the beginning. There are actually three written asylum applications here, not just two, because having changed completely her theory of the case between 1993 and 1999, Ms. Cushartega submitted a third written application to the immigration judge in March of 2000 in which she for the first time made the claim that the soldiers who stopped her on the street  As we point out in our brief, when an asylum applicant changes the story, not necessarily the theory of the case, but the story to add new details that would tend to support her claim for asylum, that permits a reasonable inference that the addition of the detail is not credible and provides substantial evidence in support of an adverse credibility finding. So actually what Ms. Cush wanted the court, the immigration judge, to proceed on was her third asylum application, which included the detail of the broken arm. And that, of course, is what Dr. Luria was prepared, or Mr. Luria, rather, was prepared to testify on, as well as Dr. Quiroga, the medical doctor. The second point that I wish to address just briefly, and this was a discussion that my colleague had with you, Your Honor, Mr. Bonpane, or Blaise Bonpane, it's not clear whether he was actually at the hearing, but my point is simply that in her brief to the court, Ms. Cush did not mention Mr. Bonpane. She concentrated on Dr. Luria, Mr. Luria, rather, and Dr. Quiroga. And we just acknowledged that, or we pointed that out on a footnote in our brief and said apparently there is no issue in this case regarding Mr. Bonpane, and that's really all I can say. We responded to the arguments made to us. So was Dr. Quiroga available to testify? Yes, he was, Your Honor. But if you look at his written proffer, all he could really testify to was that at some point she had broken her arm. He was not able to pinpoint when that occurred. If he had, if the medical evidence was that clear and that specific, that might have been important. He testified as to the kind of trauma that would have been required to have broken the arm in that way? Yes. Yes, that's in his, well, he testified, he began by summarizing what Ms. Cush had told him. He begins that way. He said it's important to remember the specifics of the petitioner's testimony. He begins that way and then gives his medical evidence with that backdrop. It's clear, it's rather clear that he was looking for evidence that was consistent with what she had told him. And as for Mr. Luria, his written proffer was clearly based entirely on his conversations with Ms. Cush. And he says that in all, every paragraph of his written affidavit said that this is based on what she told me. She reported that. She said that. He, your question, Your Honor, before was Judge Bigby, rather, was whether, Judge Bybee, rather, I'm sorry, was whether he could reasonably testify as to her credibility. Not directly would be my answer. He was obviously not in a position to say, I believe based on my own personal knowledge of circumstances in Guatemala that what she said to me was true and I'm basing my psychiatric profile on my own knowledge of circumstances in Guatemala. Now, in my brief, I acknowledge the Seventh Circuit's decision in Cursicu and I have some knowledge of that case because I briefed and argued it. And in that case, the government had a couple of insurmountable due process problems. One of them was that the petitioner was never allowed to take the stand by the immigration judge. The immigration judge conducted what he called a voir dire on certain documents that the petitioner had submitted. And having questioned the petitioner and the physical surroundings were not clear, but it sounded like the petitioner never got away from table, he never got on the witness stand, the immigration judge said, well, I just find you've submitted false documents and I'm just going to render an adverse credibility finding here and now. Case is over. The petitioner never got a chance to get on the witness stand and tell his full story about why he was eligible for asylum. That didn't happen here. This petitioner got a full chance to testify. The second problem was even worse from her point of view, which is that the petitioner had submitted a proffer from a doctor, a priest, Father Krek Kamaj, who was a State Department endorsed expert on conditions in Albania, and in his written testimony said that he had gone to Albania and had interviewed people in the Albanian government who were personally familiar with the petitioner and he was prepared to testify in support of the petitioner's case, which certainly would have been relevant to the petitioner's overall credibility, but the immigration judge didn't let Father Kamaj testify either. And the Second Circuit unsurprisingly found a very clear violation of due process by the immigration judge. That's not the case here. The two proffers that were submitted to the immigration judge, and they're in the record. She didn't exclude them from evidence. She simply said I don't find them relevant, which is a question of weighing the probity of particular pieces of evidence. She simply said I don't find that those make any difference to this case because all these gentlemen could have testified to was what the petitioner had already told them, and I have determined that this petitioner simply cannot be believed because of her propensity to constantly shift her story. But how can she make that judgment? Doesn't the Seventh Circuit case indeed say, look, it may be doomed, the negative outcome here may be given what it's saying, but as a matter of due process, the immigrant, before you get shipped away and back to a potentially hostile circumstance, if she were to be believed, has the right as a matter of due process to put her evidence on so that at least the psychologist has a shot at changing the mind of the immigration judge before he or she signs off completely. And in this case, the psychologist could have provided some information, not testifying to the credibility, but said, look, this woman, when I talked to her, was genuine. She really had these concerns and the like. That may have caused the IJ to take another look, but having peremptorily decided that nothing was going to change her mind, that was it. I respectfully chafe a bit your Honor with the word peremptorily. I think the immigration judge gave this petitioner a fair shot at telling her story. And I confess to a bit of confusion because several questions from the court to me and to my colleague have indicated an assumption on the part of your Honors that these two gentlemen, Mr. Lurie and Dr. Koroge, could not have testified as the petitioner's credibility. But if that's the case, then where are we? Does the immigration judge? Wait a minute. Credibility. Okay. Yes. I can corroborate somebody's story without saying I believe that that person is credible or not. I can say that based on what I've done, I find what she told me, her affect, her genuineness, when she told me all of this, as my medical opinion, when I'm evaluating what she is telling me, she was credible or I accepted what she had to say. And this is consistent with whatever the, I can't remember all the exact details here, but this is consistent with the behavior. It's up to the judge to decide whether that affects her, this case, and whether it's credible here. But we have another case on calendar. The line between getting to the ultimate, an expert cannot testify on the ultimate fact, but the expert is allowed to testify to those things which lay the foundation for the determiner of the fact and credibility to weigh in the balance. And that's what all I was saying here. Yes. And I think that, two points, I guess, Your Honor. First, as I've already indicated, the immigration judge did not strike these proffers, particularly Mr. Luria's affidavit from the record. If they're in the record, she simply said, I don't find them particularly relevant. And I guess the second point is that Dr. Luria, his statement, being in the record, did exactly what Your Honor suggested. He did say, I have observed this witness's demeanor, her tone of voice, her emotions. That's the problem. She may have lodged them, but she said they, she has not, she says they're not relevant. Okay. So, therefore, how are we supposed to say what weight she gave? She, that's why, that's what I meant to subsume on the draft's ungenerous characterization of the periphery. It's one thing to admit them, to say I've reviewed them, but to deny the ability to call the live witness and so on and so forth is not the same thing. I guess in the, my time is nearly up. I will only say, Your Honor, that in the Cursi-Cue case, when I argued the case before the Seventh Circuit, I made this pitch, which the Seventh Circuit vehemently rejected. My pitch was, does an immigration judge, and this is, again, the thrust of all the arguments that we've heard this morning, once again, what is the affirmative duty of the finder of fact in a circumstance like this? Does the immigration judge have an affirmative duty, having been confronted in this case with a patently unreliable. This is not an affirmative duty case. This is a due process case. Oh, sorry, Your Honor. Yes, but does the, well, does the immigration judge have a duty consistent with requirements of due process to allow supporting witnesses to testify on credibility when the main witness, the asylum applicant who bears the burden of proof, is patently not credible? I urge the Court to adopt the rule that that is not the law, and I thank the Court for its attention. My time is up. By my colleague's indulgence, I would like to ask this question. I think maybe it's a two-part question, and forgive me. What if we were to assume that the 1993 applicant, what if we were to think that the application, the 1993 application was signed in blank? In other words, she thought she was applying in good faith for the agricultural program. She didn't tell the notary the story that the notary then pens in, or we get a mix-up in papers. The notary is filling in the blanks later on and has mushed together a couple of different stories from somebody else. So the 1993 application is really not her application. She signed it. So if we don't have that, does that change what happens? Does that change the result here? And sort of secondly, is the IJ, assuming that it was, that the 1993 application was incorrect, are there any adverse sort of legal consequences to INS for her signing or filing a false application in 1993, even though she didn't do so deliberately? The last phrase, stop me, Your Honor, I was about to answer, and then your last phrase, stop me. There are consequences in the law for filing a deliberately false asylum application. That would be easy. That would be easy, but it's harder to prove it, of course. We say in our brief that her claim that she didn't know it was an asylum application and that she was actually applying for special relief as a special agricultural worker is not borne out by the record. Putting all that aside, putting the 1993 application aside, you still have the problem that there was rather substantial changes made between the 1999 application and the 2000 application where she did two things. She added a new basis for her claim of relief. She added the claim that she was also persecuted because she was a Mayan Indian. And as I have said, she added for the first time the detail that she now tries to base her entire claim on, which is that her arm was broken, not just that her arm was broken, but that her arm was broken by the soldiers who stopped her on the street. I think there would still be a serious credibility issue, even if the 1993 application was somehow excluded from the case. Is there any consequence to be drawn from the fact that she didn't sign the 2000 application? She's not filed because she hasn't signed it or she's not at fault? She put it before the immigration. I would say that if there was no testimony at the hearing, then perhaps the 2000 application is not really particularly relevant. But she did testify, of course, and she based her testimony on the trauma. The fact that she hasn't signed it doesn't impair it. It's a statement. She wrote down some words and put it into the record. It's still a record. It's still part of the record. Yes, Your Honor. I thank the Court for its attention. Good morning. Thank you. Just to address a couple of things I didn't get a chance to before. The main issue in this case is whether her due process was denied. A petitioner has a right to present all evidence that she has available to the Court. And on this day, she had the evidence of two other witnesses that she should have been allowed. Whether those witnesses corroborated her evidence is something that the immigration judge should have at least considered after hearing their testimony. Also, regarding just the clarification on the 1999 application and the amended application, the 1999 application was amended after she was placed in proceedings and then retained the services of attorneys who evaluated what was written on the 1999 application and further the other incidents that she may have gone through before in 1985. After that evaluation is when it was deemed that the 1999 application was incomplete and needed to be amended. If you review the 1999 application, when it states what is the basis of relief, it doesn't check off race, religion, political opinion, or any of those factors. It just says yes. Petitioner has informed, had informed her attorneys that that 1999 application was done after she had told her story to the person who filed it for her. Thereafter is when she retained attorneys who evaluated the application. Therefore, that is the, that's why there's a difference between both applications. I would argue that the amended application is the more accurate one because it's the one that has been done after careful consideration of the petitioner's story and evaluation by an attorney who is competent to determine whether her circumstances that she went through fall into any of the different categories for asylum, whether it's political, whether it's political opinion, whether it's race, whether it's religion, or... Mr. Maya, how could she have neglected to mention the broken arm? Your Honor, whether she neglected to mention it to the person who prepared it or whether the person failed to put it, I cannot answer that. Because that 1999 application was also... Was the 1999 application filed in English or Spanish? It was filed in English. It was filed in English. How much English does she speak? She doesn't speak English. She only had a 6th grade education in Guatemala. My understanding, she doesn't speak English. Up to this date, she doesn't speak English. Was the person who helped her prepare the 1999 application conversant in Spanish? I cannot answer that, Your Honor. All right. Thank you. This argument will be submitted. We thank both counsel for their arguments.
judges: Fisher, Bybee, Mahan